The final case on calendar for argument today is PacifiCorp v. Sixkiller. Good morning, Counsel. Good morning, Your Honors. May it please the Court, my name is Dallas DeLuca. I represent Plaintiff Appellant PacifiCorp. I'd like to reserve six minutes of my time for rebuttal. All right. There are three points I believe we need to address today. First is subject matter jurisdiction under the Tax Injunction Act. Second is that PacifiCorp's in-state customers who receive power from Chehalis are similarly situated to PacifiCorp's out-of-state customers who are allocated that same power from Chehalis. And third is in the alternative that the District Court erred in dismissing with prejudice. Before going into those three points, I just would like to set a little context here. PacifiCorp is not seeking an injunction to strike down the entire Climate Commitment Act. It is a very narrow claim seeking to enjoin just the enforcement of the no-cost allocation strategy that Ecology has imposed on the Chehalis facility. There will be many entities that are still subject to the Climate Commitment Act. Second, that this case is very important in terms of closing a hole in the Dormant Commerce Clause that the District Court opened up. Under the District Court's opinion, other states can do exactly what Ecology is doing here, which is point to some pre-existing statute or pre-existing regulation and say, oh, we can therefore go forward and enact a new regulation that discriminates against out-of-state power consumers, therefore further fracturing the regional integration of the power grid and power generation, which is exactly what the Dormant Commerce Clause needs to protect. Another thing that is important here is we're protecting customers outside of Washington from the hoarding that Washington will do. So the Supreme Court has talked about the Dormant Commerce Clause preventing states from hoarding their resources, such as in Philadelphia versus New Jersey, where New Jersey is trying to hoard the resource of solid waste disposal sites. Here, by imposing a higher cost for shipping the power out-of-state versus keeping the power in-state, the natural result will be that only Washington customers are allocated that power, which is exactly what's happened with the filing that Pacific Corps made on April 1st for what's happening for where the power will be allocated in the year 2026. So, Counselor, as I read Tracy, it suggests that what the Dormant Commerce Clause is trying to protect is competition, right? And the way I see it is how is CCA energy competitive in competition with CETA energy? Are they completely different markets, and so they're not in direct competition with each other? So the competition here, so those are regulations that are not regulating different power. They're both imposing regulations on Pacific Corps and how it has its generational portfolio. So the competition that's being protected is twofold. One, just like in Maryland versus Louisiana, there are customers outside of Washington and customers inside of Washington receiving Chehalis power, and one is going to have to pay more than the other, and they're going to be disadvantaged. And that's what the Supreme Court stated in Maryland versus Louisiana, that out-of-state customers there would be subject to the outer continental shelf first tax that the state of Louisiana was imposing while in-state customers were not, and that was a competition that they were protecting. The second competition is a competition of customers for lower-cost power, and the parents' patriot for that is the regulatory commissions for the different states. So Pacific Corps has to go to each state and say, I am providing the lowest-cost power to your states. So if – yes. But the way I read Tracy, though, it said if you remove the tax, then there would be greater competition between the unbundled and bundled, correct? Is that how you read Tracy? If you remove the tax, there would be greater competition in the segment of the market where the LDCs were competing with the independent power support. Well, it wouldn't remove – it wouldn't create greater competition among those two markets. I believe that they're saying that that was a smaller part of the segment and that there would be greater competition there or more equal competition there between LDCs and independent power producers. The extent that LDCs were competing with the independent gas suppliers for large customers like General Motors, Ford, Pontiac, but independent power producers were not competing with LDCs for the regulated customers. They're just not allowed to compete there whatsoever. So that's what I'm looking at. If the CETA energy is the ones that's going – is only in-state, correct, and CCA energy is going out-of-state, if you remove CCA, those two are not in competition with each other, correct? Just by its nature, in-state and out-of-state energy is not in competition with each other. It's the same energy coming from Chehalis, and CETA doesn't change, like, which energy is going where. It's an imposition on Pacificor that by 2030, its total portfolio has to be carbon neutral. Right. So they've got several wind facilities and hydro facilities in Lewis on the river in Washington. They could also bring power from out-of-state. So CETA is not changing or creating two different categories of power. It's just a different regulation imposed on top of Pacificor that by 2030, they have to have carbon neutrality. Wasn't that what Tracy was? It's all energy. I mean, it's all the same. It's the same product at the end of the day, correct? It is the same gas, but it's how it's sold that's different. Right. And there, there was a different bundled energy versus unbundled energy. Here, it's the same bundled energy. But from the customer's perspective, what was the difference? In Tracy or here? In Tracy, I'm sorry. Yeah. So there, the customer didn't even have access to the unbundled power. So Mr. and Mrs. Smith in Vandalia, Ohio, could not buy from an independent power producer. But what's the difference, though? It's just gas, right? At the end of the day, they're getting gas. Yes. So it's the same product from the customer's perspective. No, because from the customer's perspective, I go out as Mr. and Mrs. Smith in Vandalia, Ohio, and I only have one option. I can only buy bundled gas, transmission, distribution, generation, altogether as one. I don't have the option to go buy from independent producers. And that's what the Supreme Court said there, that they were substantively different than General Motors, who could go out and had enough resources to lay their own lines to the transmission network that had the financial resources to withstand fluctuations in power costs. So they were substantively different. Here, Pacific, where it's regulated customers in Washington, are the same as the regulated customers elsewhere. They are having the same— Well, I thought, under Washington, customers cannot get non-CETA regulated gas, correct? Well, Washington customers cannot get—well, it's electricity, and it— Sorry, electricity. The electricity has to be compliant with CETA in 2030, but that's on— So that's how I see it, very similar to Tracy, right, is that in Washington, you can't buy non-CETA energy, and so it's a different market than any other market, and so therefore the Dormant Commerce Clause doesn't apply. Except that other states have laws very similar to CETA. Oregon has what's called HB 2021 in ORS 469A.405 to .415 that is similar to CETA in phasing out greenhouse gas emission-generated electricity. So then is there a case that does that, that looks at other states' regulations to see if there's comparable regulation that then makes it, you know, what's not— From Washington's perspective, they're not substantially similar, but then you're suggesting we should look to other states' regulations to see if they are, in fact, substantially similar. Is that correct? Is there cases that do that? I've just not seen that. That's what the Supreme Court was directing the parties to do in Oregon waste systems for the Oregon Department of Environmental Quality. I thought that's at step two, though, if they are substantially similar. Well, because in there, they had decided that they were substantially similar because the only difference was cost. So your question earlier was what's the difference between CETA electricity and non-CETA. And from a customer's perspective, nothing. There's nothing in the record, there's nothing out there that I'm aware of where a customer in Washington looks at their contract with Pacificor, which is called a tariff, it's approved by the Washington Utility and Transportation Commission, nothing that says, oh, you are subject to CETA, you're going to have to have this type of power. For the customer, it's completely blind. The customer doesn't know any difference. It's just possibly, it's not even guaranteed. It's not the customer, the focus is not the customer, the focus is on the providing entities and whether or not there is a competition is being deterred. So it's not the customer, it's not focused on the customer, it's focused on the competition and whether or not the out-of-state competitor is being unfairly burdened. Sure, so there's a couple of responses I'd like to have to that, that there is competition for this electricity from Chehalis. Chehalis is an important resource. It's a gas facility, which means it's peaking so it can supply power when demand peaks and when, say, wind or solar are not available. Under this, the State of Washington Utility and Transportation Committee is essentially competing, as parents patria, with Oregon's Public Utility Commission, with Idaho, Wyoming, Utah, California, to provide the least-cost power to their customers in their states. So if Pacificor has to go to Utah or Oregon and say, your power from Chehalis is going to be 20% more expensive than if I sell it in Washington, Utah and Oregon don't like that and they're trying to compete for that same power. They say, okay, we don't want that power and Washington gets it all. And that's exactly what's happening now, which is sort of a pike effect, if we want to get on the pike road, that Pacificor, because of the CCA, on April 1st filed tariffs for 2026, reallocating all of Chehalis to Washington. So they're hoarding that resource. The other competition, I'm sorry. Counsel, do you take the position that this is a tax or not? I do not. So going back to subject matter jurisdiction, I raised it because I discovered this very late in the briefing and felt obligated under Rule 3.3 of the ethics rules. Under Beidart Brothers v. California, the three-part test, the first one, how many people pay? Here it's a very narrow subject. You don't have to explain. I just wanted to know, are you arguing that it's a tax or not? So you're not arguing that this is a tax? Correct, Your Honor. Okay. That's all I need to know. But the district court disagreed with you at the beginning of this and said these are not similarly situated and, therefore, did not evaluate the case further under the compensatory tax doctrine. If we agree with you hypothetically that these are similarly situated, then what would need to happen? It's not clear that you would necessarily win, but what would need to happen then? Well, we go back to the district court where the motion for preliminary injunction is denied as moot, and I'd refile that. And the burden on the compensatory tax doctrine will be on defendant to show under Oregon Waste Systems that the tax or the fee that's in-state that's not being charged to the in-state people, the Climate Commitment Act allowances, the amount saved there is equal to or less than the Climate Commitment Act being opposed on out-of-state. I phrased that horribly, so let me retry that. So under Oregon Waste Systems, if you want to do something discriminatory, you have to identify the in-state costs that you're compensating for. So in Oregon Waste Systems, as the Supreme Court said, Oregon had a very regulated domestic or in-state waste system. But what the state needed to do to impose a $2.25 fee versus an $0.85 fee is to identify what fees Oregon Waste was already subject to that was equal to or greater than that $2.25 per ton imposed on the out-of-state waste. Do you think we need to actually get down to the dollar amount? I thought Oregon Waste said that they could be roughly equivalent. They could be roughly equivalent. But here – So why – I mean, why wouldn't CCA and CETA be roughly equivalent? You know, they're both – and they're both trying to decarbonize energy, right, electricity. Because you have to get down to at least a rough amount of the dollar amount. Yeah. Okay. Why? I'm sorry. So go ahead.  Sorry. So here, the only thing that was on the record on the preliminary injunction motion was that under CETA, Pacificor was going to pass along approximately $900,000 of costs from CETA for 2024-2025. But we've got the allegations of over $30 million that are going to have to be passed along to customers out-of-state for the year 2023 and for each subsequent year, potentially, depending on the auction price. So the differences are vast. And also, CETA, as related to Chehalis, doesn't even come into play until 2030. Well, can you describe why courts should be – are competent to decide this? You know, Congress can move and make a decision that this is inappropriate under the Commerce Clause, right, the Affirmative Commerce Clause, the real Commerce Clause. But they haven't. And so why should we be deciding this and, like, figuring out, like, what's, you know, the rough equivalency and how much CCA is versus CETA is? It just seems like courts shouldn't be involved in things like that. Or we don't have competence to do it. I think the courts do. It's 150 years of stare decisis on dormant Commerce Clause. Sure. The courts can be involved in this. I mean, we've got tons of cases on alcohol, milk, electricity as well, and other power, where the courts say this is what the rule is. And the Supreme Court doesn't get into numbers or the Ninth Circuit. They'll kick it back down to the district courts. So the courts do have competence. They can certainly look. It's coming on defendant to be able to say that this is roughly equivalent. I see them into CCA. And what would that kind of litigation look like? Is that just expert testimony on how you value both the, you know, the carbonization mandate on in-state consumers with the free caps? And you would have an expert who would say, listen, these numbers are very far apart. And they would have an expert that says, actually, they're very close. And somebody would then have to, a fact finder would have to decide that? Well, the numbers are already there because Pacific Corp has to file in each state exactly every year or approximately every couple of years to say what their costs are for power. So in all the utility commission proceedings in the six states, they've already quantified that number. So as opposing counsels pointed out, Pacific Corp is appealing commission decisions in several states where the commissions have disallowed the climate, the CCA costs. But I thought it's the market overall, not just Pacific Corp, right? If you're asking if they're roughly equivalent, these taxes, then it's not just on you. It's on the overall market. So the overall market in each state is a captive market. So residents in Washington and Oregon and other places, you don't get to choose who your power company is.  So the competition is really between different states to see who can get the cheapest power for their customers. I think I missed your question. Well, you were just saying your response to, well, no fact finder has to figure out the cost here because we know the cost for you, for Pacific Corp. But we don't know the overall cost of the tax, which is what I think Oregon Waste is trying to get to. Sure. We know the overall cost of the CCA because Pacific Corp has to buy it. So they know exactly how much it costs. But it's just the cost of CCA to you, not the overall market. Is there no one else that's subject to the CCA? There are tons of entities, anybody above $25,000. But in terms of utilities, it's really only Pacific Corp that's shipping power out of state as a utility. Avista does a little bit, but it's really just Pacific Corp. Okay. Sorry. So I've got four minutes left. I'd like to reserve for a moment. Thank you. Thank you. Good morning, counsel. Good morning. Chris writes on behalf of Washington State. May it please the court. What Pacific Corp is asking for in this case is a complete exemption from all state regulation of greenhouse gases for emissions that occur wholly within the state's borders, as long as the power they produce at their in-state power plant is exported out of state. Pacific Corp's efforts to obtain such a loophole under the banner of the Dormant Commerce Clause fails for four reasons. First, Pacific Corp is treated exactly the same as all other utilities and power plants in the state of Washington. Second, in-state power and exported power are not similarly situated for Commerce Clause purposes. Third, CETA is centrally relevant to Washington's statutory regime here, and it cannot be ignored from the analysis. And finally, the compensatory tax doctrine, as some of your questions point out, does not apply. I think you better focus on your point too, which is why are these – why is the power that's used in-state not – dissimilarly situated from the power that's used out-of-state when it's all retail power and it's all essentially fungible power as far as I can tell? Thank you, Your Honor. Yes, the in-state power and exported power are not similarly situated because the no-cost allowances at issue in this case, they're not a free pass for in-state power to avoid carbon regulation. Quite the opposite. So the legislature – let me just address the two categories of power. So in-state power is subject to CETA's decarbonization regime, which requires dramatic, aggressive reductions in the amount of carbon associated with that power, starting with a total elimination of coal power this year in 2025 from all power supplied to Washington customers, and then carbon neutrality by 2030 and full elimination of all carbon pollution from Washington's power supply by 2045. Now, this is a faster and more complete decarbonization than what's required economy-wide by the CCA's cap-and-invest program. Exported power, by contrast, is subject to none of CETA's aggressive decarbonization requirements. How does it make the power any different? I can see why you would need this kind of correction on the back end, if you will, to account for the state's aggressive in-state decarbonization mandates. I can see why you would need that, but the question is why wouldn't you analyze that as a compensatory tax as opposed to saying the power is different? Well, let me first address those different categories and then the compensatory tax doctrine. So in General Motors v. Tracy, Tracy looked at is the product the same or not, and then also are the markets the same? And there's some kind of overlap between those two analyses, but they're both highly relevant here and I think help address this concern. In Tracy, the court found that the products were different because you had this bundled product, which meant that it didn't have to do with the actual gas you were getting. It was still just raw gas, but the bundled product meant that you got not just the final distribution but also earlier stages in the supply chain. So it was other factors related to how the gas is provided. The product was the same, though. In Tracy, the gas is the same, just like the electricity is the same here. But in Tracy, the court said, no, we have a different product. We have bundled product, which consumers can get in the captive market, whereas the out-of-state gas marketers were providing an unbundled product. So the court said, hey, that's two different products. They're not competing on that product. We have the same thing here where we have electricity subject to CETA in-state, which is one product. It's still just electricity, but it has an emissions profile associated with it that's CETA compliant and decarbonizing, whereas exported power has no carbon restrictions on it and is unbundled. So kind of like how consumers will sometimes pay more for green power versus not. It's a different product, even though it's just electrons. But Washington consumers don't have a choice, right? So they have to have the CETA product, not the CCA product. That's right. But the exported power is in a different category because those customers, wherever it goes, whether it's sold to the wholesale market, sold to Oregon or California or sold to Idaho or Utah, it has no CETA compliance with it. And when it goes to jurisdictions that don't have any restrictions on carbon emissions, there's never any carbon emissions restrictions when it hits the consumer. So as of today, the way that energy is made is different, you're saying? That's right. Because of CETA, CETA is in effect now, and it requires every utility serving Washington customers to have a plan in place to start decarbonizing. This year, they have to remove their coal-fired power from electricity that supplies Washington customers. The way I'm thinking this, tell me if I'm wrong, it's like you have apples and organic apples, right? To me, they're the same apple, but one is organic because it's the way it's made and things of that nature. Is that similar to what you're saying here? That's an excellent analogy. Yeah, the CETA-compliant power is the organic apple of electricity, and that's what Washington requires. Other states have, you know, council referenced that some other states have some kinds of carbon portfolio standards, and they specifically only reference Oregon and California. But Pacific Core has a six-state service area that includes Utah and Wyoming and other states that don't have any restrictions at all, so they don't have an organic apple requirement there. So if Pacific Core were to get the relief they're seeking here, they'd be able to export as much power as they want from their power plant in Chehalis with all the emissions. Your friend said, though, other states do have this organic apple requirement. So then how do we factor that in? Yes, so the only two states in Pacific Core's service area that do, that have significant portfolio standards, are Oregon and California, and those standards differ significantly in their scope and structure as well as their stringency. CETA is more stringent and more aggressive. Oregon, for example, requires at most a 10 percent reduction in greenhouse gases for their small utilities, so there's a big exception there. Washington has no such exception. But more importantly, Utah and Idaho have no portfolio standards at all, and Wyoming has a very vague portfolio standard that allows high emitting power such as that. So there is a loophole and a gap where Pacific Core could, even setting aside Oregon and California, they would be able to export to Idaho and have all their emissions here in Washington, essentially exporting their emissions to Washington, and then have no restrictions there. And, you know, going back to General Motors versus Tracy, the markets are also different, and that was another factor there in General Motors versus Tracy, because the captive in-state market in General Motors versus Tracy didn't compete with, you know, large producers like General Motors who could buy from anyone they wanted from the out-of-state gas producers, so there was no competition. And we have the same thing here, where we have captive in-state markets regulated in each state. Now, my friend suggested that somehow they're competing directly with each other and that there's a competitive market between every state with utilities acting as parent's patriot for basically as buyers for their citizens. And that's not really the case, Your Honor, because utility regulation is committed under the Federal Power Act to states to regulate retail electricity. So Congress has spoken and identified that states will do that. And states are not just focused solely on price. They are regulating numerous factors about how energy is produced and provided within states, including an energy policy regarding whether the electricity is bundled or unbundled, how it's produced, also its emissions profiles, things like CETA and these other portfolio standards that some states have adopted, but many have not, and also consumer protections, how many or how few consumer protections there are, what kinds of costs are recoverable, rate setting, and what is a fair economic return, and different states have slightly different standards for that. So there's many other factors going to play, and they're not simply competing. So in the state of Washington, a customer can't compete for Puget Sound Energy versus Pacific Core Energy. Is that right? It's all geographically based? That's right, yeah. Each utility has a monopoly, and that's why they're regulated by a commission. Because the way I see Tracy was that it's trying to provide when it's trying to prevent in-state advantage to in-state customers. But here, given that Puget, which is not subject to CCA, is that correct? Well, that's not correct, and that was something I wanted to point out, that Puget Sound Energy, which has only customers in Washington State, it actually also has excess capacity in power plants it owns in Washington where it exports power out of state. They sell it to the wholesale market. And Avista, another investor-owned utility, is a multi-jurisdictional utility like Pacific Core and also has power plants in Washington and exports out of state. So all of those utilities are subject to the CCA. So all in-state utilities are subject to the same regulation that Pacific Core is subject to? Correct. Well, and I thought the whole purpose of the Dormant Commerce Clause is to not advantage in-state versus out-of-state consumers. But if everyone's under the same regulation throughout, then I don't see what we're doing here. Yeah, and in some ways this is an unusual Commerce Clause. You'll notice most cases involve an out-of-state company alleging that they're being discriminated against. We don't have that here. Here we have a claim where Pacific Core is alleging that some of their business, their in-state business, is somehow being boosted and that their out-of-state business is being disadvantaged. But that's not really the standard Dormant Commerce Clause theory, right, to say you're discriminating against interstate commerce regardless of the location of the regulated entity. So that's still heartland Dormant Commerce Clause. Well, yeah, because there's interstate commerce at play, then, yeah, the Commerce Clause can come into play there. But you usually have different entities that are being discriminated against. An out-of-state entity versus an in-state entity.  That's not what we have here. That was the point I was trying to make. And, you know, this Court's decision in Day v. Henry kind of stepped back to that level to look at, hey, do we really have different treatment of these different classes at all to begin with? And in Day v. Henry, which just came out this March, this Court found that the Arizona liquor regulations, they had this in-state presence requirement, which subjected a seller to the full set of Arizona liquor regulations. The in-state presence requirement, although it did require a company to have a brick-and-mortar store, was not discriminatory because it was equally open to companies from out-of-state and in-state. You could look at this case the same way, where the no-cost allowances are equally available. They do require providing power to in-state customers, but they're equally available to all utilities. And they're not discriminating specifically against between in-state and out-of-state classes. So how is this different than the camp, the Maine camp case, the Camp Newfound case? Where their Maine was essentially discriminating against camps that catered more to out-of-state people. Yeah, the major difference here is that in Camps Newfound, there was no different regulatory system that applied to the two classes of camps. So the camps in Maine that provided, that primarily serviced in-state residents, that had in-state customers, compared to the camps that primarily had out-of-state campers, they were all subject to the same regulations. So there was nothing remotely like CETA here, which subjects in-state power to a dramatically different landscape of carbon regulation compared to out-of-state exported power. What are the limits of this? Because imagine that Washington said, well, we would like people who are workers at Chehalis, who are serving in-state, to be paid a higher wage. And we would say, and by the logic of the argument, we would say people who are buying power in-state are buying greater equity-based power than people who are buying out-of-state. I mean, wouldn't your argument allow that kind of discrimination even for things like a wage or really any other aspect of a regulatory regime? Yeah, I think that's a helpful hypothetical, Your Honor, because it shows that at some point if the regulation that someone's arguing differently situates these two classes is so attenuated from what we're actually talking about from the challenge statute, then it would not be enough to differently situate. So from the cases, we don't have a bright line test to distinguish between these. We have the rule that the two classes have to be similarly situated but treated differently in order to have discrimination. I don't really see how you could distinguish between CETA and the law that increases the minimum wage for people who are producing in-state power. It seems to me those would be the same kind of thing. It's not changing the ultimate product in the way that organic fruits are. People understand those to be different. I think that relevance provides a guide, Your Honor. So for the in-state regulation to differently situate the two classes, I think it needs to be centrally relevant and it needs to be a significant regime. Here we have a significant statewide regime, CETA, that applies across the board and it's centrally relevant. It's expressly referenced in the CCA's no-cost allowance provision, and indeed it's mechanically a critical prerequisite. Power has to be subject to CETA before it can qualify for no-cost allowances at all. So that's built into the mechanism of the statute, and for good reason. That recognizes that it's not really the in-state location that is the reason why the CCA is drawing this distinction. It's CETA. And the reason CETA applies just to in-state power is just the nature of the electricity markets. Washington, when they're looking at regulating utilities, Washington has regulated utilities to the full borders of the state, but it can't regulate the power product that's going to consumers out of state. Why is that? That's what I was wondering. Could you solve everything just like CETA? If energy is produced in state, can everything that's produced in state be subject to CETA? Yeah. So that would simplify our case, but the reason is because CETA doesn't regulate the power that's produced. CETA only regulates the consumer, the product that's going to the consumer. So it regulates the utility providing the power product to the consumer. And that's what generates the complexity that we have in this case. CETA is, to the full extent of the state's authority, decarbonizing electricity's power grid. But because it's regulating utilities, it's not in terms of their provision of power and the power supply, it doesn't regulate the actual direct generation of greenhouse gases at power plants and other facilities. It kind of brings up what Tracy said, that of course we're not really competent to figure all this stuff out, and we should maybe stay away. Can I ask if we get to the part two, if we say it is substantially similar, but then we look at the compensatory taxes? Based off of the record we have before us now, can we decide that issue? No, Your Honor, you can't. And I think you're correct that that's a step two that you don't get to. But if you did, in addition, there would be the other question of, is there even different treatment to begin with under Day v. Henry to consider? But if you got past all that, then on remand, yeah, the state could present a compensatory tax, and that would be more fact-intensive, potentially. But there, the point I want to make is that it's really not appropriate for comparing costs the way Pacific Corp would like to. I mean, these costs are not really knowable, right? They all depend on how fast the energy transition takes place over many years and what kind of technological developments there are and what kinds of economic developments there are, both under CETA and the CCA. So it's not true that we have the costs and know what they are. Under CETA, that's going to be happening over time as decarbonization happens. And then under the CCA, it doesn't have a set price like a tax or a fee. It's a variable market pricing system as a cap-and-trade system, and what those costs are going to be are going to depend upon how demand changes as entities economy-wide decarbonize and what kind of demand there is for CCA compliance costs. So a compensatory tax would be very unworkable here, even if we got there. What is aligned— Unworkable meaning it would be just difficult to figure out what the answer is? Yes, I think so. It would be expert testimony on estimates. It wouldn't be hard data. But what is available here is that the regulatory goals between CETA and the CCA are aligned. They're both decarbonizing at similar rates, and so there's a balance there. That's my thought. Why can't we just say that the regulatory goal is the same at the roughly equivalent and then at step two say that that's fine? I think that potentially—I haven't thought about that in a compensatory tax frame, but I think the fact that the regulatories are aligned shows why CETA is centrally relevant to differently situate these two classes. And if you have differently situated classes, then you don't get any further because you can't have discrimination between differently situated classes. Instead, you have different treatment for different types of classes, and that's what we had in TRACIE. Let me just check. I also want to point out that this court's LensCrafters decision from 2009 is also helpful, I think, in explaining that even if you don't have the same product in the same market, if you don't look at it that way, that you can still have differently situated classes due to the differential application of a regulatory regime. So in LensCrafters, we had opticians selling eyeglasses, and the court considered that they were differently situated than optometrists and ophthalmologists who were subject to California's licensing regime as health professionals. And they found, well, they're differently situated, so California could have differential regulation of those two classes. And then finally, to help with kind of where the line is or the limiting principle on considering what kind of state regulation would be enough to differently situate, I think the Day v. Henry case at the Arizona District Court and the Fifth Circuit's Wine Country gift basket case that we referenced are helpful. And they look at if you were to grant the relief that plaintiff is requesting, would it grant them dramatically greater rights than the in-state interest? And that's exactly what we have here in the district court below. I don't know that. I mean, that gets to the whole question, right, which is what would be – I don't think there – we would have to figure out whether the compensatory tax doctrine applies, but I thought your position would be this all is evened out. If you actually did the analysis, what the expert testimony would show is that this is just all evened out. Well, I think my point there, Your Honor, was that the in-state powers that's decarbonizing under CETA and out-of-state power that's going to be subject to the CCA, they have a big-picture aligned goal of decarbonization, so you're going to see a big-picture general similarity there. I think that's true. However, here the point I was trying to make about the dramatically greater rights is just that essentially that there would be – what Pacificor wants is a big loophole. And it's not that they're saying we want to have the same thing that's subject to in-state because their exported power is not going to be subject to CETA. They're not going to be decarbonizing at that same rate. What they want is to say under the Adornment Commerce Clause theory that somehow they would get a loophole where they have no regulation for that. And that – Day v. Henry and Wine Country said if that's the result that you get from granting the relief, that helps show you that they were not in the same position to begin with. And that's – so it's just indicative of the fact that the exported power is exempt from CETA while the in-state power is fully subject to decarbonization under CETA. All right, Counsel, you've exceeded your time. Do you want to wrap up? Thank you. Well, we would ask the Court to affirm. Apologize. Thank you. No worries. Rebuttal. Thank you, Honor. A couple things I'd like to address. First off, that the big loophole doesn't exist. The big loophole is a product of the State of Washington's own decision in 2019 to implement CETA itself. So CETA is implemented first. The – so the ab initio situation was that customers in Washington would eventually be subject, potentially, to higher prices because of CETA. Later on, they imposed the CCA. States are not free to say, oh, we've got this preexisting tax that impacts or preexisting regulation that impacts just our citizens. Therefore, we can come along and have something different come along to discriminate. If the State of Washington wants to refurbish all of its highway systems, and they pay for that by a 1 percent tax on property taxes in the State of Washington, then you realize that it's not enough money. And a couple years later, they say, we're going to toll our roads. But we're not going to toll our roads for people who pay Washington State property tax to pay for that. We're only going to tariff people that come from out-of-state and use our roads. They can't do that. That's a violation of the Dormant Commerce Clause. It interferes with interstate commerce. Counsel, what's your strongest case that addresses an in-state entity as opposed to – two in-state entities as opposed to one in-state entity and one out-of-state entity? What's your strongest case? Because normally it involves an entity who is outside the state trying to do business in the state.  Kemp's Newfound Owatonna. So there you had an in-state entity that was being discriminated against because they were catering to out-of-state customers. It's the case that Judge Briss mentioned.  Okay. But you would agree, though, under the CCA and CETA, there's no in-state entity that's being advantaged, right? So under CETA – Under the entire regulatory regime, there's no in-state actor being advantaged. Sure. Every resident in Washington of Chehalis Power – Entity.  Yeah, the producer side. Consumers. Well, on the producer side, no. But this is on the consumer side. Everybody who's receiving Chehalis Power has an advantage over everybody who's receiving Chehalis Power outside of Washington. What case takes it to the level of the consumer as opposed to whether or not the entity itself is being disadvantaged? What case can you cite to the – Maryland – I'm sorry, Your Honor. Maryland v. Louisiana. I'm sorry to interrupt. It's just a short time. Maryland v. Louisiana, where the Supreme Court said that out-of-state customers are going to be subject to the first-use tax, while customers inside Louisiana would not. Was that with – Go ahead. Did that involve an out-of-state entity? Well, the plaintiffs and the defendants there were the states themselves. There were a lot of other parties involved. So the discrimination there was that the tax, when it left Louisiana, was going to be subject to a first-use tax. But if you used it within Louisiana, you would get an exemption from that. And therefore, customers of that tax would have an advantage over out-of-state customers. Under the Donut Commerce Clause. Yes, and that was found to violate the Romer's Commerce Clause and was struck down. Can you tell me what's wrong with my analogy, the organic apples versus a regular apple? Why is this the same situation? I'm not quite sure where that one was going. Okay, so in my view, if you believe the state's view that the CETA has decarbonized the production of energy so that it's kind of like an organic apple that's more green, whereas energy not subject to CETA, it doesn't have that advantage. And so they're a different product. Because here, the claim is very narrow. This is only about power from Chehalis. We're not talking about Pacific Core's entire portfolio. So here, it is the exact same apple. It's not a different apple. My good counsel from the other side keeps talking, I'm over time, but they keep talking about how there's a emissions profile. There's no such thing as an emissions profile. The emissions profile from Chehalis is going to be the same wherever it goes because it's the same amount of carbon that's emitted per megawatt regardless of where it goes. But how is Chehalis then complying with CETA then? It doesn't have to until 2030, which is the other point, that even if you say that CETA has an effect, it's not here yet. And it may have no effect because if the price of gas goes up. But I'm sure you're doing research and figuring out how to be in compliance and you're spending a lot of money based off of that. But the cost doesn't go to the customer yet because it can only go to the customer after it's used and useful. And the cost that's in the record is minimal for in-state compared to the dozens of millions for the power going out of state. So if CETA applies, the way the energy is produced will be different. It could be. And it could be. And it also, the cost then, because we're talking about cost, everything that the district court, I'm way over time, but everything the district court and plaintiffs, excuse me, defendants talked about, the only difference is cost. When the only difference between the two sides, in-state and out-of-state, is cost, that's never seen in any of the cases as not being similarly situated. That always goes into the compensatory tax analysis. I'm way over time. I'm not way over time, but you're over. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court. We are in recess until 9.30 a.m. tomorrow morning. Thank you, Your Honors. All rise.
judges: RAWLINSON, BRESS, BUMATAY